# RECORD NO. 14-1362

In The

# United States Court Of Appeals

## For The Fourth Circuit

## SUNDERSINGH BALA,

*Plaintiff – Appellant,*

**v.**

## COMMONWEALTH OF VIRGINIA DEPARTMENT OF CONSERVATION AND RECREATION,

*Defendant – Appellee.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

_____

## BRIEF OF APPELLANT

_____

**Scott Gregory Crowley**
**CROWLEY & CROWLEY**
**4870 Sadler Road, Suite 300**
**Glen Allen, Virginia  23060**
**(804) 205-5010**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO

2.     Does party/amicus have any parent corporations?                                          YES     NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                                  YES     NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     YES     NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     YES     NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?     YES     NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____        _____
        (signature)                        (date)

# TABLE OF CONTENTS

PAGE:

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................2

STATEMENT OF THE CASE.............................................................2

       Statement of Facts...........................................................4

SUMMARY OF ARGUMENT ............................................................13

ARGUMENT ...........................................................................13

       Standard of Review.........................................................13

I.     The July 7, 2011 Agreement was crafted not to bar appellant's retaliation claim........................................................14

II.    Genuine issues of material fact exist precluding summary judgment of appellant's claims .........................................21

       A.    Summary Judgment Standard .................................21

       B.    Evidence Supports Appellant's Prima Facie Case of Retaliation ......................................................22

             1.    Temporal proximity ......................................22

             2.    Different treatment.........................................23

             3.    Pattern of antagonism ....................................23

       C.    Appellee's Proffered Reason for Lay-Off are Rebutted by Evidence and Pretextual.........................24

1.      2005 desk audit ................................................................25

2.      Acceptance of enhanced retirement ...............................26

CONCLUSION ..............................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

TABLE OF AUTHORITIES

PAGE(S):

CASES:

Alexander v. Gardner-Denver Co.,
    415 U.S. 36 (1974)......................................................................................14

Atwater & Co. v. Panama R.R. Co.,
    246 N.Y. 519, 159 N.E. 418 (1927) ............................................................19

Cahill v. Regan,
    5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505 (1959) ..........................19

Cirillo v. Arco Chem. Co.,
    862 F.2d 448 (3d Cir. 1988) ........................................................................15

Clark County Sch. Sys. v. Breeden,
    532 U.S. 268 (2001)................................................................................ 22-23

Desert Palace, Inc. v. Costa,
    539 U.S. 90 (2003).......................................................................................22

Evans v. Technologies Applications & Serv. Co.,
    80 F.3d 954 (4th Cir. 1996) .........................................................................24

Furnco Construction Corp. v. Waters,
    438 U.S. 567 (1978)......................................................................................22

Gilliam v. South Carolina Dept. of Juvenile Justice,
    474 F.3d 134 (4th Cir. 2007) ........................................................................21

Int'l Brotherhood of Teamsters v. U.S.,
    431 U.S. 324 (1977)......................................................................................23

Johnson v. Lebanese American University,
    922 N.Y.S.2d 57 (App. Div. 2011)...........................................17, 18, 19, 20

Kass v. Kass,
    91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) ........................19

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)..............................................................................22

Neal v. Ferguson Constr. Co.,
    237 F.3d 1248 (CA10 2001).................................................................23

Overstreet v. Kentucky Central Life Ins. Co.,
    950 F.2d 931 (4th Cir. 1991)................................................................21

Pellegrini v. Brock,
    65 A.D.3d 971, 885 N.Y.S.2d 413 (2009)...........................................18

Ray Communications, Inc. v. Clear Channel Communications, Inc.,
    673 F.3d 295 (2012) .............................................................................13

Ross v. Communications Satellite Corp.,
    759 F.2d 355 (4th Cir. 1985) ...............................................................21

Sylvia Dev. Corp. v. Calvert Cnty.,
    48 F.3d 810 (4th Cir. 1995) ............................................................ 13-14

Todd Marine Enters., Inc. v. Carter Mach. Co.,
    898 F. Supp. 341 (E.D. Va. 1995)........................................................21

Torrez v. Public Service Co. of New Mexico, Inc.,
    908 F.2d 687 (10th Cir. 1990) ........................................................14, 15

Watkins v. Scott Paper Co.,
    530 F.2d 1159 (5th Cir.), cert. denied, 429 U.S. 861 (1976) ........................14

Weston v. Pennsylvania,
    251 F.3d 420 (3d Cir. 2001) ................................................................24

STATUTES:

26 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1331 .......................................................................................1

28 U.S.C. § 1343(3) ..................................................................................1

iv

42 U.S.C. § 2000e-2.................................................................................3

42 U.S.C. § 2000e-3...................................................................1, 3, 14, 16

<u>RULES</u>:

Fed. R. Civ. P. 12(b)(6)...........................................................................3

Fed. R. Civ. P. 56..................................................................................21

Fed. R. Civ. P. 56(c).........................................................................1, 21

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over appellant's claim for retaliatory discharge under Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3 under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(3) (violation of civil rights).   The District Court granted appellee's Motion for Summary Judgment, dismissing the appellant's claim in its entirety, with prejudice, under Fed. R. Civ. P. 56(c) by Order and Memorandum Opinion (JA 414) and Order (JA 424) dated March 27, 2014, which was a final order.

This Court has jurisdiction under 26 U.S.C. § 1291 (appellate jurisdiction over all final orders of district courts).

The appellant, acting *pro se*, filed his Notice of Appeal with the District Court on April 15, 2014, within 30 days of the date of the final Order, making this appeal timely.  The appellant, again acting *pro se*, filed his Informal Opening Brief with this Court on May 12, 2014.

By letter dated October 22, 2014, the Clerk of this Court advised the parties that the Court had "determined that consideration of the issues presented would be substantially aided by preparation of a formal brief by an attorney."  Accordingly, the undersigned counsel, who had previously represented appellant in the

proceeding before the District Court, made an appearance on behalf of the appellant on November 20, 2014.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court err in construing a written agreement between appellant, acting *pro se*, and appellee that resolved a separate underlying state employee grievance, which made no mention of appellant's claim for retaliation then pending with the U.S. Equal Employment Opportunity Commission, barred any subsequent civil action for retaliation.

2.     Whether the District Court err granting granted summary judgment against the appellant's claims of retaliation in his lay-off and forced retirement when his position was not targeted for elimination and appellant adduced direct evidence that acrimony over appellant's repeated complaints of race and national origin discrimination were the cause of his layoff?

## STATEMENT OF THE CASE

Plaintiff-appellant was an employee of the Commonwealth of Virginia, of East Indian origin.  Acting *pro se*, the appellant commenced this civil action on November 6, 2012 by filing a Complaint against his employer, the Commonwealth of Virginia, Department of Conservation and Recreation ("DCR"), in the United States District Court for the Eastern District of Virginia, Richmond Division (the Honorable Henry E. Hudson, District Judge, presiding, Case No. 3:13cv748).

That Complaint asserted violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2 and 3 for race and national origin discrimination and retaliation for two separate occurrences; (1) laying off appellant from his position on September 8, 2009 by falsely claiming that he had volunteered for early retirement; and (2) declining to interview him for the vacant grants manager position in favor of ten other applicants with less experience and qualifications than he.

On November 20, 2012, the appellee filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). By written Memorandum Opinion and Order dated January 3, 2013, the District Court granted the Motion to Dismiss.

Appellant noted an appeal from that Memorandum Opinion and Order, and submitted an Informal Opening Brief. By per curium order dated July 5, 2013, this Court affirmed the District Court's dismissal of appellant's discrimination claim arising from his layoff, but vacated the judgment dismissing appellant's discrimination claim relating to appellee's failure to select appellant for an interview and for retaliation relating to appellee's decision to lay off him. These latter claims were remanded for further proceedings.

The undersigned counsel appeared on appellant's behalf before the District Court. On December 10, 2013, appellant filed an Amended Complaint (JA 10) focusing entirely on appellant's claim for involuntary layoff in retaliation for

3

complaining of age, race and national origin discrimination in the course of a state employment grievance.

Appellant settled his state employee grievance through a written Agreement dated July 7, 2011. (JA 380-82) That Agreement made no mention of plaintiff's claim of retaliatory discharge that the parties were aware at the time was pending with the U.S. Equal Employment Opportunity Commission ("EEOC"). Plaintiff maintained that since the Agreement expressly limited itself "to the grievance dated October 2009," his claim for retaliation was unaffected by the Agreement. He commenced legal action upon receipt of a Notice of Right to Sue from the EEOC.

On March 27, 2014, the District Court (Hon. Henry E. Hudson, U.S.D.J., presiding) entered summary judgment on behalf of the defendant, holding that the grievance Agreement barred any subsequent action. (JA 414, 424)

Statement of Facts

1.      Appellant is a naturalized citizen of the United States of America of East Indian descent. He is 75 years of age and was employed at an Account Senior in the Division of State Parks, DCR since 1985. (JA 11)

2.      Appellee is a department of the executive branch of the Commonwealth of Virginia. (JA 11)

3.      Throughout his tenure with DCR, appellant has filed numerous internal grievances and charges with the EEOC alleging discrimination on account of his East Indian national origin or his age.  He has claimed that since 1985, appellee has repeatedly declined to elevate him to other positions within the department even though he was better qualified than the other applicants.  (JA 11-12)

4.      In or about February of 2009, appellee posted a job opening for an Accounts Payable Supervisor, Position #00010.  On or about April 27, 2009, appellant was informed that he was not selected for the position, but instead appellee hired a younger African American female.  (JA 12)

5.      Appellant believed that he was more qualified than the individual selected or the applicants invited for the final interview because he had previously held the Accounts Payable Supervisor position for ten years.  On or about May 27, 2001, appellant initiated a grievance through the Commonwealth of Virginia employee grievance procedure alleging that his non-selection was prompted by bias against his age and national origin.  (JA 12)

6.      The State grievance procedure has three internal levels of review, or steps, followed by a hearing by a neutral hearing officer. At Step One, an employee grievance is sent to the employee's supervisor for either resolution or an explanation as to why the grievance is being refused.  If the employee is

5

unsatisfied with the Step One response, he or she is permitted to advance the grievance to Step Two, which entails resolution or response by the second-line supervisor. If the employee remains unsatisfied with the response, the employee may advance the grievance to the Department head, or his designate, for a Step Three or final response. (JA 12)

7.    In the Step Three response to appellant's grievance dated July 10, 2009, Deputy Director of DCR William Price attempted to administratively close the grievance asserting that Mr. Bala was impeding DCR's operations by filing numerous complaints and grievances. DCR's Director of Human Resources William Brenzovich assisted Price with the preparation of the Step Three response by providing him with the statistical information cited therein. (JA12)

8.    The Step Three Grievance Response stated in part:

> You have been employed by the Department of Conservation & Recreation a total of 22 years between 1985 and 1996, and again between 1998 and 2009. During these periods, you have filed a total of 34 complaints including 19 employee grievances, 12 Federal EEOC complaints, 2 state EEO complaints and one federal law suit. Of the 34 complaints, 24 alleged discrimination based on race/age or retaliation, the same basis as your current complaint. While you withdrew 4 of these complaints, none of the remaining 20 have been ruled in your favor. The time and resources involved in processing these grievances and state and Federal EEOC complaints over the past 22 years have been extraordinarily disproportionate compared to all other complaints received by the agency; i.e. since 2003 only 10 other similar actions have been received for the **"entire agency"**. DCR has spent thousands of dollars to pay for Administrative Hearings and Agency Advocate services just related to your cases, not counting the value of staff time and the associated lost productivity. In addition,

significant staff time was also required to research and respond to
your nine Freedom of Information Act requests submitted since
March 2006. At the same time the agency was expending resources
and losing productivity associated with your complaints, you were
proven guilty of defrauding the agency of 397 work hours (almost 50
work days) during 2006 and received appropriate disciplinary action.

                    *                    *                    *

In sum, based on previous rulings by Judge T.J. Markow and
Administrative Hearing Officers cited herein, it is determined that this
current grievance is not based on new evidence not already ruled on,
has no merit and is opined to be submitted by you only to harass the
agency or otherwise impede its efficient operations.

(JA 12-13)

9.      Appellant appealed the administrative closure of his grievance to the

Department of Employment Dispute Resolution (EDR). In a decision dated August

20, 2009, EDR concluded that appellant had asserted sufficient new evidence to

support his claims of discrimination and retaliation to rebut the assertion that

appellant's grievance was interposed solely to harass and impede the operation of

the department. EDR noted: "Closing a grievance on these grounds is an extreme

sanction." (JA 13)

10.     Shortly thereafter, the Office of the Governor of the Commonwealth

of Virginia notified departments of impending budget cuts and asked human

resource officials in departments to make plans for budget cuts including possible

employee layoffs. (JA 13)

11. The then-Director of DCR, Joseph H. Maroon, informed Mr. Brenzovich of his desire to seek layoffs among employees considering retirement and who could be enticed to accept a layoff and early retirement package that included an enhanced state pension. (JA 13)

12. Sometime in July or August of 2009, DCR Budget Manager Glen Scott ran into appellant in the men's room and mentioned that DCR was offering employees early retirement packages with enhanced pensions. As this was the first that appellant had heard of an early retirement offer, he replied that he would like to see the details in order to consider it. (JA 14)

13. Mr. Scott informed Mr. Brenzovich that appellant was interested in accepting the layoff and early retirement. Mr. Brenzovich subsequently approached appellant about the layoff, and asked appellant to contact him if appellant wished to accept the early retirement. Appellant decided not to retire and thus never contacted Mr. Brenzovich to accept the retirement. (JA 14)

14. Appellant thereafter informed his supervisor Nancy Heltman that he did not want to retire. (JA 14)

15. The Director of DCR's Division of State Parks, Joe Elton, was asked to compile a list of individuals who might be interested in accepting voluntary layoff. Appellant was not included on that list. Appellant's name was, however, was subsequently included on that list by a team that included Mr. Maroon and Mr.

Brenzovich.  Neither Mr. Elton, Mr. Walh nor Ms. Heltman recommended that appellant's name be added to the list of individuals who should be laid off. (JA 14; 275)

16.     On or about September 8, 2009, appellant was confronted by Mr. Brenzovich and Assistant Director of the Division of State Parks Warren Wahl and formally announced that he was being laid off effective December 31, 2009 unless he elected to accept an early retirement. (JA 14)

17.     Appellant replied angrily that he had refused the voluntary retirement, and that he was involuntarily laid off in retaliation for charging the agency with age and national origin discrimination in his pending grievance. (JA 14)

18.     In response to an e-mail from appellant dated September 9, 2009 asking to know the reasons for the layoff, Mr. Brenzovich stated:

> Good day.  Please remember, you were approached about the enhanced retirement because you told Glen Scott that you were interested in a buy-out.  Also, you were given a deadline to me; however, you did not.
>
> As I told you on Tuesday, your lay-off was considered a business decision.  Furthermore, 16 employees are being laid-off.  I am counting three non-general fund positions that are not addressed in Mr. Maroon's e-mail to all staff.  If you noticed in Mr. Maroon's e-mail, the lay-offs crossed all lines of employees, supervisors and managers.
>
> The Division of State Parks has seven lay-offs to include you.

(JA 14-15)

19.    Of the seven employees laid off from the Division of State Parks, only appellant was laid off involuntarily.  (JA 15)

20.    Feeling pressured and under duress from being included in the layoff against his will, appellant accepted the early retirement package of enhanced severance, effective December 31, 2009. (JA15)

21.    On October 5, 2009, appellant submitted Grievance Form A to initiate the Virginia State Employee Grievance Procedure to object to the lay off and forced early retirement.  (JA 370)  The grievance was assigned number 9285 and identified the following issues:

- Misapplication of the Commonwealth of Virginia Layoff Policy and Procedure #1.30.

- Discrimination against me on the basis of national origin and race.

- Retaliation against me on the basis of previous filed EEOC charges, court cases, and grievances.

(JA 370)

22.    On November 2, 2009, the appellant filed a Charge of Discrimination with the EEOC alleging retaliatory discharge.  (JA 16, 388)

23.    The hearing office dismissed appellant's claims identified in the grievance, namely misapplication of the layoff policy, discrimination and retaliation.  (JA 345-48)

10

24. Following an Administrative Review of the Director of the Virginia Department of Employment Dispute Resolution dated January 31, 2011, the hearing officer's decision relating to appellant's claim for violation of the layoff policy was reversed and remanded to the hearing officer. (JA 358-65)

25. Accordingly, on February 1, 2011, the hearing officer determined that DCR "did not comply with the terms and conditions of the Commonwealth of Virginia Layoff Policy and Procedure Number 1.30." (JA 373) The hearing officer directed that appellant be reinstated to his former position. (JA 374)

25. The order of reinstatement was complicated by two facts: (a) that appellant had already begun working for DCR in his previous capacity on a part-time, hourly basis; and (b) that appellant has been receiving pension benefits since the beginning of 2010, which would have to be reimbursed to the Commonwealth. (JA 375-76)

26. Accordingly, the hearing officer decision prompted the parties to discuss settlement. (JA 377)

27. On March 22, 2011, the appellant, acting *pro se*, met with DCR Human Resources Director Brenzovich to discuss appellant remaining as a part-time employee and making no pension reimbursement to the Commonwealth. (JA 375) The proposal was reduced to four written points in a letter from Brenzovich to appellant dated May 3, 2011:

11

- You would sign whatever document agreeing to forget about the Hearing Officer's Ruling of re-instatement.

- DCR would maintain you as a wage employee performing your present duties at your currently hourly rate.

- DCR would permit you to keep your current enhanced retirement, which you would if DCR does not reinstate you.

- DCR would promise/guarantee that your current wage position would not be abolished nor would DCR separate you for at least three (3) years, with the understanding that you may leave sooner.

(JA 375)

28.    The foregoing points were repeated in an e-mail from Brenzovich to

appellant dated May 3, 2011.  He stated:

> Based on this, he will draft an agreement to cover the points that you requested and DCR agreed.  Please understand that the document will be reviewed by the Attorney General's Office.

(JA 377)

29.    The Agreement was executed July 7, 2011.  Paragraph 5 of the

Agreement provides:

> THE PARTIES HEREBY DECLARE that the terms of this Agreement have been completely and carefully read and are fully understood and voluntarily accepted.  This agreement only apply to the grievance dated October, 2009 or/and case # 9295 Hearing officer final decision issued on February 1, 2011.

(JA 381)

12

<u>SUMMARY OF ARGUMENT</u>

The agreement dated July 7, 2011 made no mention of the appellant's then-pending claim for retaliatory layoff.  It addressed the hearing officer's decision, which in turn concerned the claimed violation of the State Layoff Policy # 1.30.  Indeed, the pre-agreement written communication between appellant and the representative for appellee indicated that appellant released only his rights to reinstatement.  The agreement contained no language that would alert the appellant that he was waiving his retaliation claim pending with the EEOC.

Summary judgment was otherwise inappropriate, given that there exists genuine issues of material fact disputing appellee's proffered reason for layoff.  There is documented evidence that appellant was forced into a layoff against his stated interest to remain employed, and documented evidence of officials of appellee displaying animosity towards appellant because of his lengthy history of filing grievances and court actions alleging age, race and national origin discrimination.

<u>ARGUMENT</u>

<u>Standard of Review</u>

Court of Appeals review grants of summary judgment under a *de novo* standard.  <u>Ray Communications, Inc. v. Clear Channel Communications, Inc.</u>, 673 F.3d 295, 299 (2012), citing <u>Sylvia Dev. Corp. v. Calvert Cnty.</u>, 48 F.3d 810, 817

(4th Cir. 1995) ("In reviewing a summary judgment, we apply de novo the same standard that the district court was required by law for granting the motion for summary judgment.")

I.    The July 7, 2011 Agreement was crafted not to bar appellant's retaliation claim.

While employment discrimination claims under both Title VII and Section 1981 may be waived by agreement, "the waiver of such claims must be knowing and voluntary." Torrez v. Public Service Co. of New Mexico, Inc., 908 F.2d 687 (10th Cir. 1990), citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n. 15 (1974). "Waivers of federal remedial rights, however, are not lightly to be inferred." Id., citing Watkins v. Scott Paper Co., 530 F.2d 1159, 1172 (5th Cir.), cert. denied, 429 U.S. 861 (1976).

In considering whether a general release was knowing and voluntary, some circuit purport to apply ordinary contract principles and focus primarily on the clarity and language in the release. The majority of circuits, however, explicitly look beyond the contract language and consider all relevant factors in assessing a plaintiff's knowledge and the voluntariness of the waiver. In doing so, these courts have considered the following circumstances and conditions under which the release was signed:

(1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether [p]laintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and

14

accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

Id. 908 F.2d at 689-90, citing Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988) (waiver of ADEA rights).

Apply the foregoing principles, the clear and specific language of the Agreement states that it applies "to the grievance dated October, 2009 or/and case # 9295 Hearing officer final decision issued on February 1, 2011." (JA 381, Agreement ¶ 5) Further, ¶ 4 of the Agreement states: "Grievant AGREES to waive any rights accorded to him pursuant to the hearing officer's decision of February 2, 2011, including his reinstatement to his former salaried position." (JA 381) The express and precise language of the Agreement – prepared by appellee -- has no bearing on appellant's claim of retaliation.

At the time that the Agreement was executed, appellee was aware of appellant's Charge of Discrimination claiming retaliation pending in the U.S. Equal Employment Opportunity Commission. (JA 230, ¶ 29.) Yet the Agreement does not address that claim of retaliation and expresses that it "contains the complete understanding and agreement of the parties." (JA 381, ¶ 8)

There is no basis for claiming that appellant knew or should have known he was waiving his retaliation claim when he signed an agreement that studiously avoided any mention of his retaliation claim. There was ample opportunity to negotiate the agreement, and the record contains not only the Agreement itself (JA

15

380-82) but a letter discussing the discussions regarding the agreement (JA375-76) and an e-mail regarding it dated May 3, 2011 (JA 377). None of the negotiations contemplate dismiss or waiving the retaliation claim then pending in the EEOC.

Although the appellant's original grievance filed October 5, 2009 alleged the three allegations of (1) layoff policy violation, (2) race discrimination and (3) retaliation (JA 370); the only matter on which the matter proceeded through its arduous administrative history was on appellant's claim regarding the layoff policy. (JA 373-74) It is clear from the terms of July 7, 2011 Agreement (JA 380), and the letter and e-mail communication preceding it, that the parties were focused solely on the layoff policy. There is no indication from the parties or the terms of the Agreement that the parties contemplated a release of the appellant's retaliation claim that was pending in the EEOC. Had that been the parties' intention, it could have been addressed clearly an ambiguously by referencing the retaliation claim in the Agreement.

Finally, the consideration afforded the appellant in exchange of the waiver was simply that he not pay back the enhanced severance benefits received between January 2010 and July 2011 that would have been due upon his reinstatement. (JA 375-76) Neither the Agreement nor the grievance in which he prevailed afforded plaintiff any of the remedies available in the event he prevailed in a Title VII

16

retaliation case, including equitable compensatory front pay damages or non-economic damages.

The issues raised herein are similar to those raised in <u>Johnson v. Lebanese American University</u>, 922 N.Y.S.2d 57 (App. Div. 2011).  There plaintiff was terminated from an administrative position and signed a release stating he received money "as an ex-gratia payment in full settlement of any and all claims and entitlements related to my services of whatsoever nature with the above mentioned University."  The release further stated:

> I therefore hereby remise, release and completely discharge the Lebanese American University and all its responsible officers of and from all actions or rights that I may ever have against the University in respect of my above mentioned service.

<u>Id</u>. at 58.

The plaintiff in <u>Johnson</u> subsequently learned of facts that formed the basis of a discrimination action.  In response to a motion for summary judgment, the plaintiff asserted that the compensation "represented back payment that was owed to me by Defendants, including payment for unused vacation and sick time."  <u>Id</u>. at 59.  The court denied defendants' motion, and allowed plaintiff to provide evidence of his understanding of the release.

First, the court set forth the familiar principles of contract interpretation, specifically:  "[L]anguage in a contract will be deemed unambiguous only if it has . . . a definite and precise meaning, unattended by danger of misconception in

17

the purport of the agreement itself, and concerning which there is no reasonable

basis for a difference of opinion." Id. at 59 (citations and quotations omitted).

The court then proceeded to consider the matter, which bears inclusion

herein:

> On their motion for summary judgment, defendants bore the burden
> of establishing that the Release was unambiguous as a matter of law
> and that there were no material issues of fact regarding whether it
> precluded the claims asserted by plaintiff in his complaint. Defendants
> satisfied their initial requirement by submitting the Release. However,
> plaintiff raised a triable issue of fact as to whether a release of
> discrimination claims was "fairly and knowingly made." He did this
> by stating that it was his "understanding" that the Release was simply
> an acknowledgment that the $4,651.94 payment that defendants would
> make upon receipt of the executed document represented everything
> he was already owed at the time of his termination, and that he had no
> right to challenge the amount at a later date. Whether plaintiff had a
> valid basis for such an "understanding" cannot be determined on this
> record. Indeed, plaintiff does not reveal who or what led him to form
> this belief. Further, if plaintiff had inquired into the meaning of the
> term "ex-gratia," he might have realized that, contrary to his
> "understanding," defendants considered the payment gratuitous.
> However, it is significant that defendants did not challenge the
> legitimacy of plaintiff's "understanding" or offer an affidavit by
> anybody at the university who was involved in the preparation of the
> Release. Accordingly, we adhere to the well established principle that
> evidence submitted in opposition to a motion for summary judgment
> should be accepted as true (see Pellegrini v. Brock, 65 A.D.3d 971,
> 885 N.Y.S.2d 413 [2009]).

Id. at 60.

Appellee cannot carry its burden of showing that appellant fairly and

knowingly waived his claim for retaliation.  The writings between the parties

establish that no such waiver was contemplated.  (JA 375-77)  The Agreement

itself makes no mention of the pending EEOC Charge of Discrimination, which

would be required if the Agreement was intended to be a knowing and voluntary

waiver of that claim.  Instead, the Agreement focused on the Hearing Officer's

decision of February 1, 2011, which was based solely on appellant's claim under

State Layoff Policy 1.30.  (JA 380-82)

The dissent in <u>Johnson</u> argued that the releasor's subjective intent as to what

he was releasing is irrelevant.  But, as here, the court noted the existence of

objective evidence that the release was not intended to be a full waiver of all rights:

> However, the dissent ignores the principle that where there is
> objective evidence that the release was not intended to cover certain
> claims, the releasor will not be barred from asserting those claims (see
> <u>Cahill v. Regan,</u> 5 N.Y.2d 292, 299, 184 N.Y.S.2d 348, 157 N.E.2d
> 505 [1959]). As discussed above, on this record we cannot resolve the
> precise scope of the Release. Moreover, the dissent disregards well
> settled rules of construction by reading the operative words of the
> document in a vacuum. In interpreting contractual language, a court
> must
>
> " 'consider the relation of the parties and the circumstances
> under which it was executed. Particular words should be considered,
> but in [84 A.D.3d 433] the light of the obligation as a whole and the
> intention of the parties as manifested thereby' " (<u>Kass v. Kass,</u> 91
> N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 [1998], quoting
> <u>Atwater & Co. v. Panama R.R. Co.,</u> 246 N.Y. 519, 524, 159 N.E. 418
> [1927]).
>
> Here, accepting as true plaintiff's statement that the release was
> prepared specifically in connection with wages and benefits owed to
> him at the time of his termination, one can reasonably construe the
> document as waiving claims related to his earnings, and nothing else.

<u>Id</u>. at 62.

19

Addressing the issue of consideration paid for the Agreement, the <u>Johnson</u>

court held:

> If plaintiff's version of events is correct, then the scope of the release
> is not necessarily as broad as defendants contend. Plaintiff maintains
> that he was paid only what he was already owed, and that he was
> given no additional benefits that would have constituted consideration
> for a release of discrimination claims. If that is true, then he could not
> have been expected to understand that he was relinquishing his right
> to sue for claims unrelated to pay and benefits. Moreover, the Release
> does not on its face preclude the narrow scope urged by plaintiff. If
> the parties indeed intended the release to settle payment and benefits
> issues only, then it makes sense that they used language releasing
> claims related to the "services" plaintiff provided in exchange for
> those payments and benefits.

<u>Id</u>. at 61.

The consideration paid to appellant is only what he would have received for

foregoing reinstatement.  There was no exchange of compensation owed for

reinstatement and appellant remained a wage employee.  Moreover, appellee

guaranteed appellant's wage employment for three years only (contingent upon

good performance) (JA 381 ¶ 3) – a limitation that had no basis in the Hearing

Officer's decision.  Appellee paid appellant no additional consideration for

waiving a pending EEOC claim.

II.  Genuine issues of material fact exist precluding summary judgment of appellant's claims.

    A.  Summary Judgment Standard.

"In determining whether the moving party has shown that there is no genuine issue of material fact, we must assess the factual evidence and all inferences to be drawn there from in the light most favorable to the non-moving party."  Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

> An award of summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Gilliam v. South Carolina Dept. of Juvenile Justice, 474 F.3d 134 (4th Cir. 2007).

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate if "there is no genuine issue as to any material fact and the . . .  moving party is entitled to judgment as a matter of law;" for the evidence to present a "genuine" issue of material fact, it must be "such that a reasonable jury could return a verdict for the nonmoving party."  Todd Marine Enters., Inc. v. Carter Mach. Co., 898 F. Supp. 341 (E.D. Va. 1995).  Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, nor is appropriate even where there is no dispute as to the evidentiary facts but only as to the conclusion to be drawn there from.  Overstreet v. Kentucky Central Life Ins. Co., 950 F.2d 931 (4th Cir. 1991).

B.    Evidence Supports Appellant's Prima Facie Case of Retaliation.

Under the familiar burden-shifting formulation of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny, allow for the use of circumstantial evidence concerning a causal connection between protected activity and adverse action, and causal connection to create an inference of retaliation in the absence of direct evidence.  See, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (statute does not imposed burden on claimant to adduce by direct evidence that respondent would have reached same decision without illegal discrimination). Under the burden-shifting scheme, the appellant has

> the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not such actions were based on a discriminatory criterion illegal under the Act.

Furnco Construction Corp. v. Waters, 438 U.S. 567, 576 (1978)

1.    Temporal proximity

The temporal proximity alone between the appellant's engaging in protected activity (complaining of discrimination) and the adverse action taken against him (involuntary lay-off) are sufficient to create a triable issue of fact on the question of retaliation.  The Supreme Court has held:  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark

22

County Sch. Sys. v. Breeden, 532 U.S. 268, 273 (2001), citing Neal v. Ferguson

Constr. Co., 237 F.3d 1248, 1253 (CA10 2001).  DCR's Bill Price and Bill

Brenzovich issued the Third Step Grievance Response on July 10, 2009, the

precise time – July 9-11, 2009 -- that these gentlemen decided to include appellant

in the lay-off without asking him and without seeking input from either appellant's

first and second line supervisors (Heltman and Elton, respectively).

        2.    Different treatment

Proof of discriminatory motive necessary for a disparate treatment case, "it

can in some situations be inferred from the mere fact of difference in treatment."

Int'l Brotherhood of Teamsters v. U.S., 431 U.S. 324, 335 n. 15 (1977).  Here,

internal e-mail communications from appellee's own decision-making managers

that appellant's "situation was being considered differently than the rest."  (JA

252)  DCR's Director ordered budget cuts were to be achieved through voluntary

lay-offs enticed by enhanced retirement packages for those wishing to retire early,

and not by targeting unnecessary positions or articulating business efficiency.  (JA

227, ¶ 11; 278-79)  But appellant, on the other hand, was laid off involuntarily

despite noting his vehement objection to it.  (JA 228, ¶¶ 17-19)

        3.    Pattern of antagonism

Further, a causal connection between protected activity and adverse action

sufficient to satisfy the appellant's prima facie burden can be established by a

pattern of antagonism by employer towards the employee's protected activity.  <u>See</u>,

<u>Weston v. Pennsylvania</u>, 251 F.3d 420, 431 (3d Cir. 2001).  Here, antagonism of

Price and Brenzovich towards appellant and his complaints of discrimination is

amply demonstrated in the text of the Third Step Response that angrily denounced

appellant's various grievances and claims of discrimination.  (JA 233-35)

> The time and resources involved in processing these grievances and
> state and Federal EEOC complaints over the past 22 years have been
> extraordinarily disproportionate compared to all other complaints
> received by the agency; <u>i.e.</u> since 2003 only 10 other similar actions
> have been received for the **"entire agency"**.  DCR has spent
> thousands of dollars to pay for Administrative Hearings and Agency
> Advocate services just related to your cases, not counting the value of
> staff time and the associated lost productivity.  In addition, significant
> staff time was also required to research and respond to your nine
> Freedom of Information Act requests submitted since March 2006.

(JA 233)

    C.    <u>Appellee's Proffered Reason for Lay-Off are Rebutted by Evidence
and Pretextual</u>.

After the employer satisfied its burden of production, "the presumption of

unlawful discrimination created by the prima facie case 'drops out of the picture'

and the burden shifts back to the employee to show that the given reason [is] just a

pretext for discrimination."  <u>Evans v. Technologies Applications & Serv. Co.</u>, 80

F.3d 954, 959 (4th Cir. 1996).

The well-rehearsed story that appellant was laid off (1) for business

necessity, and (2) because he requested it, are inherently contradictory and

pretextual. The reasons are contradictory because if it would not matter that if appellant requested it if the lay-off was required by business necessity, and *vice versa*. The reasons are pretextual because the internal e-mail communications reveal absolutely no discussion of either the desk audit or appellant's desire for early retirement before he filed his grievance of the lay-off.

      1.   <u>2005 desk audit</u>

The numerous e-mails between the decision-makers are completely devoid of any discussion of the 2005 desk audit, or the supposed lack of full-time work, that appellee currently relied upon as justification for the lay-off. (JA 243-52; 262-66) In a telling e-mail exchange September 9, 2009 plaintiff pointedly asked Mr. Brenzovich "would you please let me know the reasons for laying me off." (JA 263) The response was "you told Glen Scott that you were interested in a buy-out. Also, you were given a deadline to respond to me; however, you did not." (JA 263) Then Mr. Brenzovich added "your lay-off was considered a business decision." (JA 263)

In reply, the appellant repeated his question: "Would you please let me know the business decision for laying me off." (JA 264) While that would likely have been the most opportune moment to mention the 2005 desk audit had it actually reason for the lay-off, no mention was made. Instead, it appears that

appellee uncovered the heretofore forgotten desk audit in time to use it as evidence to support a lay-off occurring four years later.

The audit apparently made little impact on the appellant's direct supervisor, Ms. Heltman, who denied in deposition ever being informed that plaintiff needed additional work, or believing that appellant needed additional work.  To the contrary, she testified that appellant's already adequate workload was increased when he was compelled to absorb the burden of a part-time assistant to the appellant left state employment.  (JA 269-73)

Nor was the audit brought up when Mr. Elton asserted that if the plaintiff was laid off, he wanted the job to remain classified as a full-time position.  (JA 247)

2.    Acceptance of enhanced retirement

While the numerous e-mails express a hope that appellant could be enticed into accepting a lay-off, there was no mention of the bathroom discussion between him and Glen Scott until after plaintiff grieved the lay-off.  (JA 243-52)  Indeed, the deposition testimony of Mr. Brenzovich and Ms. Heltman was consistent that plaintiff fought the lay-off and accepted the enhanced retirement package reluctantly only after being told he was be involuntarily laid off.  (JA 227-28, ¶¶ 12, 17, 23.)

The first time the Glen Scott discussion is mentioned in the internal e-mails

is in a November 4, 2009 note from HR representative Kathi King who was

preparing response to appellant's lay-off grievance. She said:

> I'm just editing Price's response to Bala's grievance. When we talked
> you said that Bala told you on more than one occasion that you'd be
> interested in in [sic] layoff because it would be a good opportunity. I
> just want to verify this.

(JA 245)

It was Mr. Scott who expressed interest in a lay-off, not plaintiff. Mr. Scott

replied:

> Sunder and I had various conversations about this over the months
> preceding our July 2009 submission of our reduction strategies.
>
> I think we even started the discussions during the Sept. 2008 budget
> cuts.
>
> Sunder and I both agreed that in each of our situations if we were
> laid off, we would be happy with the enhanced retirement option.
>
> Once the decision was reached to eliminate Sunder's position, I never
> brought up the discussion again, nor did Sunder.
>
> As I recall, we discuss eliminating that position back during the 2008
> cuts, but it never went the list.
>
> For the 2009 cuts, we were talking various options, and I mentioned
> my conversations with Sunder and his name was put on the list.

(JA 245)

Moreover, appellant mentioned interest in the enhanced severance only in

the event that he was laid off, i.e., separated from employment against his will, not

27

that he would accept voluntary lay-off in order to receive an enhanced severance. Mr. Scott confirmed that appellant was placed on the lay-off list without regard to his wishes, his supervisors' wishes, or business necessity.  The foregoing statement from Scott not only appeared for the first time four months after the lay-off, but is qualitatively different from the position put forward in this litigation that appellant requested the lay-off.

### CONCLUSION

For the reasons stated herein, the appellant respectfully requests that the Order of the District Court granting summary judgment for appellee be reversed and the matter remanded for further proceedings.

/s/ Scott Gregory Crowley
Scott Gregory Crowley
CROWLEY & CROWLEY
4870 Sadler Road, Suite 300
Glen Allen, Virginia  23060
(804) 205-5010

*Counsel for Appellant*

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   this brief contains <u>6,436</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated:  February 27, 2015          <u>/s/ Scott Gregory Crowley</u>
                                   Scott Gregory Crowley

                                   *Counsel for Appellant*

<u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on February 27, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Gregory C. Fleming
OFFICE OF THE ATTORNEY GENERAL
900 East Main Street
Richmond, Virginia  23219
(804) 786-5636

*Counsel for Appellee*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219